Oday Salim
Mich. Bar No. P80897
University of Michigan Law School
Environmental Law & Sustainability Clinic
701 S. State St., Jeffries Hall 3018
Ann Arbor, MI 48109
(734) 763-7087
osalim@umich.edu

Kate Chupka Schultz
OR No. 221174
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org

*Attorneys for Defendant-Intervenors the
Center for a Humane Economy and Animal
Wellness Action*

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:26-cv-00246-JMB-SJB |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF THE CENTER FOR A HUMANE ECONOMY AND ANIMAL WELLNESS ACTION'S MOTION TO DISMISS** |
| THE STATE OF MICHIGAN; TIMOTHY BORING, in his Official Capacity as Director of the Michigan Department of Agriculture and Rural Development; and DANA NESSEL, in her Official Capacity as Attorney General of Michigan, | |
| Defendants, | |
| and | |
| HUMANE WORLD FOR ANIMALS, et al., | |
| Defendant-Intervenors, | |
| and | |

1
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

THE CENTER FOR A HUMANE
ECONOMY, et al.,

    Defendant-Intervenors.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

I.      Introduction.................................................................................................... 7

II.     Background..................................................................................................... 7

        A.     State markets and animal welfare. ........................................................ 8

        B.     Michigan's SB 174 ............................................................................. 9

III.    Rule 12(b) Standard. .................................................................................... 13

IV.     Argument ..................................................................................................... 13

        A.     Plaintiff United States lacks standing. ................................................ 13

        B.     The complaint should be dismissed under Rule 12(b)(6) because Plaintiff's preemption claims fail as a matter of law. ........................................... 17

               1.    The United States must overcome a strong presumption against preemption in this case................................................................. 17

               2.    The EPIA is a food inspection and identification law that neglects upstream, pre-harvest production practices. ...................................... 18

               3.    The EPIA does not expressly preempt SB 174............................... 20

V.      Conclusion ................................................................................................... 23

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) .................................................................. 13, 14, 15

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) ...................................................... 17, 18, 20

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022).......................................................... 15

*Ash v. Anderson Merchs., L.L.C.*, 799 F. 3d 957 (8th Circuit 2015) ......................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 13

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) .............................................. 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................... 13

*Berman v. Parker*, 348 U.S. 26 (1954) ........................................................................ 9

*Carney v. Adams*, 592 U.S. 53 (2020) ....................................................................... 14

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286 (6th Cir. 2006) 14

*Craig v. Boren*, 429 U.S. 190 (1976)......................................................................... 14

*Cresenzi Bird Imps., Inc. v. New York*, 658 F. Supp. 1441 (S.D.N.Y. 1987) ................ 8

*FEC v. Akins*, 524 U.S. 11 (1998)............................................................................. 14

*Linda R. S. v. Richard D.*, 410 U.S. 614 (1973) ....................................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 13, 14, 15

*Lyshe v. Levy*, 854 F.3d 855 (6th Cir. 2017)............................................................ 14

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .................................................... 17, 18, 19

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995)............................................................................................................ 18

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ............................... 8, 9

*People v. K. Sakai Co.*, 56 Cal. App. 3d 531 (1976) ................................................. 8, 9

*Retail Clerks v. Schermerhorn*, 375 U.S. 96 (1963) ................................................. 17

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982)................................................... 20

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)..................................................... 17, 18, 20

*Saginaw Cty. v. STAT Emergency Med. Servs.*, 946 F.3d 951 (6th Cir. 2020)....................... 14, 16

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024)......................................................... 15

*Thomas v. Toms King (Ohio II), LLC*, 997 F.3d 629 (6th Cir. 2021) .......................................... 13

*Triumph Foods, LLC v. Campbell*, 156 F.4th 29 (1st Cir. 2025) ........................................... 19, 22

*United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888)........................................................ 14

*United States v. Texas*, 599 U.S. 670 (2023) ............................................................................. 16

*United States v. West Virginia*, 295 U.S. 463 (1935) ................................................................. 16

*Warth v. Seldin*, 422 U.S. 490 (1975)....................................................................................... 16

*Wyeth v. Levine*, 555 U.S. 555 (2009) ...................................................................................... 17

**Statutes**

21 U.S.C. § 1031..................................................................................................................... 19

21 U.S.C. § 1032..................................................................................................................... 19

21 U.S.C. §1052 ................................................................................................................ 17, 20

Organic Foods Production Act, 7 U.S.C. § 6501 *et seq*.................................................................. 8

House Bill 5127 (codified at Mich. Comp. L. § 287.746(1)-(7) (2009))................................ 10, 11

Senate Bill 174 (codified at Mich. Comp. L. § 287.746(1)-(9) (2020)) ........................... 11, 15, 16

**Other Authorities**

Egg Products Inspection Act: Hearing Before the Committee on Agriculture and Forestry, 91st
     Cong. (1969) ................................................................................................ 19, 20, 21

*Farm Animal Confinement Bans by State*, Am. Soc'y for the Prevention of Cruelty to Animals,
     https://www.aspca.org/improving-laws-animals/public-policy/farm-animal-confinement-
     bans (last visited Apr. 8, 2026) ............................................................................ 8

Feeding the Economy: 2026 Economic Impact Study (2026),
     https://feedingtheeconomy.com/wp-content/uploads/2026/03/Feeding-the-Economy-
     Report-2026.pdf................................................................................................ 9

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

House Legislative Analysis, Bill Analysis of H.B. 5127, 95th Leg. (Mich. Jan. 20, 2010), *available at* https://www.legislature.mi.gov/documents/2009-2010/billanalysis/House/pdf/2009-HLA-5127-6.pdf.......................................................... 10

Justin Sullivan, *All Eggs in Michigan Will Be Cage-Free by 2024*, WXYZ Detroit (Nov. 22, 2019), https://www.wxyz.com/news/all-eggs-in-michigan-will-be-cage-free-by-2024.. 11, 12

Mich. H.R. Journal, 103d Leg., Reg. Sess. 23 (Mar. 5, 2025), https://www.legislature.mi.gov/documents/2025-2026/Journal/House/htm/2025-HJ-03-05-023.htm ...................................................................................................... 10

Michigan Department of Agriculture and Rural Development, Michigan Agriculture Facts & Figures 2023, https://www.michigan.gov/-/media/Project/Websites/mdard/documents/business-development/mi_ag_facts_figures.pdf?rev=880dd023f529407cb2580b90503d7d7d (last visited Apr. 8, 2026) ......................................................................................... 10

*Michigan Senate votes to delay cage-free ban for hens*, Associated Press (Oct. 25, 2019), https://www.wisfarmer.com/story/news/2019/10/25/michigan-senate-votes-delay-cage-free-ban-hens/2454323001/ ....................................................................... 12

Nicole Pallotta, *Michigan Becomes Latest State to Ban Eggs from Caged Hens*, Animal Legal Defense Fund (Jan. 1, 2020), https://aldf.org/article/michigan-becomes-latest-state-to-ban-eggs-from-caged-hens/........................................................................ 12

U.S. Dep't of Agric., Nat'l Agric. Statistics Serv., Chickens and Eggs (Feb. 2022), https://usda.library.cornell.edu/concern/publications/fb494842n.................................... 10

**Rules**

Federal Rule of Civil Procedure 12(b)........................................................................... 13

**Regulations**

88 Fed. Reg. 75394 (Nov. 2, 2023)................................................................................. 8

Iowa Admin. Code r. 12-36.8(3)................................................................................... 21

S.C. Code Regs. § 5-228(1) ......................................................................................... 22

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## I.      Introduction

Senate Bill ("SB") 174 was enacted to ensure that eggs sold within Michigan are produced in a manner consistent with evolving standards of animal welfare and consumer expectations. The Michigan Legislature determined that prohibiting the sale of eggs from caged production systems would promote more humane treatment of laying hens while aligning the marketplace with the values of Michigan residents and ensuring the fruitful survival Michigan's egg farmers.

At its core, this case presents an unwarranted federal intrusion into a traditional area of state authority. Here, the federal government seeks to invalidate a duly enacted state law reflecting the considered judgment of Michigan's legislature and the expressed values of its residents. However, the United States lacks the requisite standing to bring this action because it has not suffered a cognizable injury—nor does it identify any specific and concrete sovereign or proprietary interest harmed by this state policy.

Even if standing could be established—which it cannot—the complaint fails as a matter of law because SB 174 is not preempted by the Egg Products Inspection Act ("EPIA"). Congress did not intend to displace any and all state laws governing eggs. Congress especially did not intend to displace state laws that touch on areas neglected by the EPIA, such as SB 174's upstream, pre-harvest concerns. SB 174 operates harmoniously with federal law by addressing matters beyond the scope of federal regulation—namely, laying hens' housing and ethical standards demanded by consumers. The statute neither conflicts with federal requirements nor frustrates the purposes and objectives of Congress.

Accordingly, the complaint should be dismissed in its entirety.

## II.      Background

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### A.  State markets and animal welfare.

States began formulating animal anti-cruelty laws hundreds of years ago, *see National Pork Producers Council v. Ross*, 598 U.S. 356, 365 (2023), and these laws are now part of the fabric of governance in every state. They address countless concerns, including malicious cruelty, dogfighting and cockfighting, puppy mills, wildlife products import, farm animal welfare, and more. In the face of these advancements, Congress has remained silent on the subject of farm animal confinement, much less humane husbandry or sales of products from intensively confined animals.[1] Humane standards for the raising of farmed animals, especially as this husbandry comprises and interacts with a state's economy, remain entirely within states' purview. As of now, more than one dozen states and counting have laws touching upon intensive confinement of farmed animals.[2] Some of these laws incorporate prohibitions against the sale of certain products deemed undesirable due to certain farming practices. But this is nothing new: states have banned various products from entering their market out of welfare concerns falling squarely within states' rightful police power. *See, e.g.*, *People v. K. Sakai Co.*, 56 Cal. App. 3d 531, 535 (1976) (upholding California state ban against the sale of whale meat in a Supremacy Clause challenge) (cleaned up); *Cresenzi Bird Imps., Inc. v. New York*, 658 F. Supp. 1441, 1446 (S.D.N.Y. 1987) (holding New York law requiring wild birds sold in state to have been raised in captivity, be marked with leg bands from birth, and imposing record requirements, is not

---

[1] The only federal regulations on humane farm animal confinement are found under the National Organic Program's regulations, most recently updated at 88 Fed. Reg. 75394 (Nov. 2, 2023), but these regulations only apply to products that opt into the federal organic labeling system. They are more aptly described as labeling regulations, rather than humane husbandry rules, and are not enacted pursuant to the Federal Meat Inspection Act ("FMIA") or EPIA, but rather the Organic Foods Production Act, 7 U.S.C. § 6501 *et seq.*

[2] *Farm Animal Confinement Bans by State*, Am. Soc'y for the Prevention of Cruelty to Animals, https://www.aspca.org/improving-laws-animals/public-policy/farm-animal-confinement-bans (last visited Apr. 8, 2026).

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

preempted by federal quarantine laws nor the Endangered Species Act), *aff'd*, 831 F.2d 410 (2d Cir. 1987). *See also Ross*, 598 U.S. at 387 (examples of product bans against horsemeat; fireworks; single-use plastic bags).

Regulations of morality, safety, and health are the "traditional" applications of the police power. "Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it." *Berman v. Parker*, 348 U.S. 26, 32 (1954). The scope of the police power is not only broad and delimited in scope, but also flexible and evolving. It "changes with changing social and economic conditions." *People v. K. Sakai Co.*, 56 Cal. App. 3d at 535. "It is not a circumscribed prerogative, but is elastic and . . . capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race." *Id.* (cleaned up).

Michigan's SB 174 is emblematic of such an evolution.

### B.  Michigan's SB 174

Agriculture plays a central role in Michigan's economy. The state's agricultural sector contributes tens of billions of dollars annually to the state economy and supports hundreds of thousands of jobs across farming, food processing, and related industries.[3] Michigan is also among the most agriculturally diverse states in the nation, producing hundreds of different commodities including dairy products, meat, fruit, vegetables, and eggs.[4]

---

[3] Feeding the Economy: 2026 Economic Impact Study 49-50 of 106 (2026), https://feedingtheeconomy.com/wp-content/uploads/2026/03/Feeding-the-Economy-Report-2026.pdf.
[4] *Id.*

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Egg production is a significant part of Michigan's agricultural output.[5] In 2023, Michigan ranked seventh in the nation in egg productions, producing over five billion eggs every year.[6] Michigan is consistently among the top ten egg-producing states, with more than 16 million laying hens producing roughly five billion eggs annually.[7]

Michigan's journey to becoming a "cage free" state has been over a decade in the making. Motivated by growing concerns over intensive confinement practices in modern animal agriculture, in 2009 Michigan enacted Public Act 117 (House Bill ("HB") 5127, codified at Mich. Comp. L. § 287.746(1)-(7) (2009)) and became one of the first states to mandate a phase-out of traditional battery cages for egg-laying hens.[8] HB 5127 prohibited a farm owner or operator from "tethering or confining a covered animal (gestating sow, veal calf, or egg-laying hen) on a farm all day or for the majority of the day in a manner that prevents the animal from lying down, standing up, fully extending its limbs, or turning around freely." HB 5127 § 46(2). More specifically, for egg-laying hens, "fully extending [a hen's] limbs" was defined as "fully spreading both wings without touching the side of an enclosure or other egg-laying hens and having access to at least 1.0 square feet of usable floor space per hen." HB 5127 § 46(1)(g). In

---

[5] *See* Mich. H.R. Journal, 103d Leg., Reg. Sess. 23 (Mar. 5, 2025), https://www.legislature.mi.gov/documents/2025-2026/Journal/House/htm/2025-HJ-03-05-023.htm.
[6] *See* Michigan Department of Agriculture and Rural Development, Michigan Agriculture Facts & Figures 2023, https://www.michigan.gov/-/media/Project/Websites/mdard/documents/business-development/mi_ag_facts_figures.pdf?rev=880dd023f529407cb2580b90503d7d7d (last visited Apr. 8, 2026).
[7] *See* U.S. Dep't of Agric., Nat'l Agric. Statistics Serv., Chickens and Eggs (Feb. 2022), https://usda.library.cornell.edu/concern/publications/fb494842n; *see also* Mich. H.R. Journal, 103d Leg., Reg. Sess. 23 (Mar. 5, 2025), *available at* https://www.legislature.mi.gov/documents/2025-2026/Journal/House/htm/2025-HJ-03-05-023.htm.
[8] House Legislative Analysis, Bill Analysis of H.B. 5127, 95th Leg. (Mich. Jan. 20, 2010), *available at* https://www.legislature.mi.gov/documents/2009-2010/billanalysis/House/pdf/2009-HLA-5127-6.pdf.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

order to afford Michigan farmers ample time to come into compliance, the bill gave farms ten years to transition to compliance with the law.[9]

A decade later, in 2019, Michigan passed SB 174, codified at Mich. Comp. L. § 287.746(1)-(9) (2020), after receiving bipartisan support in both chambers of the state legislature. SB 174 amended and expanded the same Animal Industry Act. It maintained HB 5127's prohibition on housing covered animals in a manner that prevents the animal from either "[t]urning around freely" or "[l]ying down, standing up, or fully extending its limbs. HB 5127 § 46(1)(g). SB 174 then transitioned Michigan's animal welfare standard from a minimum space requirement in HB 5127 to a cage-free mandate. For hens specifically, SB 174 prohibited farm owners or operators from housing hens "in an enclosure other than a cage free housing system." SB 174 § 46(2)(b)(i). Additionally, it prohibited a business owner from knowingly selling any product of an egg-laying hen whose confinement conditions are inconsistent with the cage free housing standards. SB 174 § 46(4). These conditions could not include cage systems like "battery cages, colony cages, enriched cages, or enriched colony cages, or any cage system similar to those systems." *Id.* § 46(1)(b)(iv), (2)(b)(i). To meet this requirement, enclosures must provide hens "enrichment that allow the hens to exhibit natural behaviors" and include "scratch areas, perches, nest boxes, and dust bathing areas." *Id.* § 46(1)(b)(ii). The law had a five-year phase-in period. *Id.* § 46(9).

SB 174 was largely driven by market trends toward cage-free production, influenced by evolving consumer preferences.[10] After signing the bill, Lt. Gov. Garlin Gilchrist stated, "Michigan is known for having one of the most diverse agricultural and farming industries in the

---

[9] *Id.*

[10] Justin Sullivan, *All Eggs in Michigan Will Be Cage-Free by 2024*, WXYZ Detroit (Nov. 22, 2019), https://www.wxyz.com/news/all-eggs-in-michigan-will-be-cage-free-by-2024.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

nation. Signing this bill is the right thing to do. This will ensure that our standards are amongst the strongest in the nation when it comes to protecting animal welfare, while ensuring that egg producers are able to continue to thrive."[11] The bill's sponsor was Republican state Senator Kevin Daley, from Lum, within the agricultural Lapeer County. In describing his intent behind the bill, Senator Daley said that "[i]t's critical that we help our farmers meet the industry demands and remain competitive in retail markets[.]"[12] He went on: "Michigan egg production is a $650 million business, *and if the state did not establish new standards, egg farmers likely would go out of business or move to another state* because of the commitment the marketplace has made to switch to cage-free housing standards by 2025, which would disrupt the economic impact egg production has on the state."[13] (Emphasis added.)

In other words, Michigan passed these laws to ensure that their egg production industry remains competitive with the evolving standards placed by consumer preference on the market and the concomitant market shift happening across the country. Further, without banning the in-state sale of caged eggs, Michigan's own egg farmers would be at a disadvantage by having to compete with a potential flood of cheaper eggs pumped into the state by huge industrial agriculture conglomerates located elsewhere. By combining the in-state cage-free housing requirement with a sales ban, Michigan has been able to accomplish two intertwined goals: one, to ensure future market competitiveness of Michigan-grown eggs; and two, to shape the Michigan egg market around humane standards—i.e., creating a more "humane economy."

---

[11] *Id.*

[12] *Michigan Senate votes to delay cage-free ban for hens*, Associated Press (Oct. 25, 2019), https://www.wisfarmer.com/story/news/2019/10/25/michigan-senate-votes-delay-cage-free-ban-hens/2454323001/.

[13] Nicole Pallotta, *Michigan Becomes Latest State to Ban Eggs from Caged Hens*, Animal Legal Defense Fund (Jan. 1, 2020), https://aldf.org/article/michigan-becomes-latest-state-to-ban-eggs-from-caged-hens/ (reciting Sen. Daley and Lt. Gov. Gilchrist's statements give to local media).

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### III.    Rule 12(b) Standard.

To survive a Federal Rule of Civil Procedure 12(b) motion to dismiss, a complaint must demonstrate that plaintiff's claims are more than just "conceivable," but are in fact "plausible on [their] face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In applying this plausibility standard, the Court should disregard conclusory statements, even when "couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

"A claim has facial plausibility when the [p]laintiff pleads factual content that allows the [c]ourt to draw the reasonable inference that the [d]efendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., L.L.C.*, 799 F. 3d 957, 960 (8th Circuit 2015) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When evaluating a motion to dismiss, a Court does not need to accept a legal conclusion "couched as a factual allegation." *Id.* at 678.

### IV.    Argument

#### A.  Plaintiff United States lacks standing.

To invoke federal jurisdiction under Article III, a plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).  These "well-worn yet enduring standards," *Thomas v. Toms King (Ohio II), LLC*, 997 F.3d 629, 634 (6th Cir. 2021), require a plaintiff to "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). So too must there be "a causal

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

connection between the injury and the conduct complained of … [and] it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (cleaned up).

These three elements make up the "irreducible constitutional minimum of standing." *Id.* at 560. A plaintiff does not establish standing when they make an abstract claim of injury that is of "general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff" is to that interest. *Carney v. Adams*, 592 U.S. 53, 59 (2020) (citations omitted). *See also Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 291 (6th Cir. 2006). A plaintiff may not raise generalized grievances. *Id.* (citing *FEC v. Akins*, 524 U.S. 11, 23-25 (1998)). Nor can plaintiff raise the rights of third parties. *Id.* (citing *Allen v. Wright*, 468 U.S. at 751 and *Craig v. Boren*, 429 U.S. 190, 193-94 (1976)).

These requirements extend to the federal government, which "must show that, like the private individual, it has such an interest in the relief sought[.]" *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888) (holding federal government must demonstrate a concrete interest in the relief sought). Governments are "no different from any other private entity or individual who has a legal quarrel with someone else. Like these other potential claimants, [it] must show an imminent or actual injury before it enters the federal courts." *Saginaw Cty. v. STAT Emergency Med. Servs.*, 946 F.3d 951, 954 (6th Cir. 2020) (county plaintiff did not show actual injury; injury was wholly speculative). An abstract or philosophical injury is insufficient. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).

Here, the United States has failed to establish an injury cognizable under Article III standing jurisprudence, and so lacks standing.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

First, the United States lacks a concrete injury in fact. Since the federal government is not the "object of the government action" here—as the government is not an egg seller or producer—standing is "'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. at 758). SB 174 governs a narrow class of private actors: commercial egg retailers. The law states that a "business owner shall not knowingly engage in the sale of any shell egg in this state that the business owner knows or should know is the product of an egg-laying hen that was confined in a manner that is inconsistent with the requirements of this section." SB 174 § 46(4). But the United States does not allege that it produces, sells, or distributes eggs in Michigan. Nor has the United States alleged that it is a consumer-purchaser of eggs in Michigan. So, the United Staes faces a higher, "substantially more difficult" bar over which to establish standing.

The United States identifies no concrete impact that would constitute an injury-in-fact. The complaint summarily and implausibly alleges that SB 174, by itself, has raised prices for American consumers generally. Compl. ¶ 3, ECF No. 1, PageID.2. But here, rather than alleging any injury to the federal government's own property or operations, the federal government is asserting the economic rights of private businesses (to sell any eggs) and the financial interests of consumers (to buy any eggs, or to purchase at cheaper prices)—all of whom are third parties. These contingent injuries, "especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022).

The United States has not claimed, for example, that SB 174 threatens the government's proprietary interests, like owning land or participating in a business venture. *Cf. Tennessee v. Dep't of Educ.*, 104 F.4th 577, 588 (6th Cir. 2024) (holding that states have proprietary standing

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

to sue when state entities reliant on state funds become subject to federal regulations threatening those funds).

In *Saginaw,* the Sixth Circuit found that "someone violat[ing] a law…does not by itself injure the government in an Article III way. Only 'actual or threatened interference with [its] authority' does." *Saginaw*, 946 F.3d at 956 (citing *United States v. West Virginia*, 295 U.S. 463, 473 (1935)). But the United States has failed to identify any specific, concrete way in which SB 174 *actually* prevents the United States from carrying out its inspection duties, or any other actions, under the EPIA. (This is because it cannot: because SB 174 and the EPIA can easily coexist, *see infra* Part IV(B).)

Sixth Circuit prudential standing requirements preclude litigation in federal court "when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens," or where instead of litigating "his own legal rights and interests" the plaintiff instead "rest[s] his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The United States is not the object of Michigan's enforcement authority—SB 174 imposes misdemeanor penalties and fines exclusively on "business owner[s]." SB 174 § 46(4). And a plaintiff cannot "'contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *United States v. Texas*, 599 U.S. 670, 674 (2023) (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Nor can a sovereign establish standing by pointing to the "indirect" economic effects of another sovereign's enforcement priorities. *See United States v. Texas*, 599 U.S. at 680 n.3 (noting that policies "frequently generate indirect effects" elsewhere, including financial effects, but when only indirect effects are alleged, standing claims become "attenuated").

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Plaintiff's claims here thus amount to nothing more than 1) generalized grievances asserted on behalf of third parties, and 2) abstract and inoperative harm to "sovereignty" that has no identified real impact on federal operations. Neither of these are bases for standing.

### B. The complaint should be dismissed under Rule 12(b)(6) because Plaintiff's preemption claims fail as a matter of law.

Section 1052(b) of the EPIA contains an express preemption clause that provides, "[f]or eggs which have moved or are moving in interstate or foreign commerce … no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards[.]" 21 U.S.C. §1052(b)(1). By prohibiting the sale of certain eggs within the state, SB 174 addresses legitimate concerns about animal welfare and consumer preferences; however, it does not impose additional or alternative standards of egg quality, condition, weight, quantity, or grade, and therefore does not trigger preemption under EPIA. 21 U.S.C. §§ 1052(b)(1).

There are "two cornerstones" of preemption analysis. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 494 (1996) (alteration in original) (internal quotation marks omitted); also citing *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963) and *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). And second, a strong presumption against preemption, especially in a field where the State has traditionally occupied. *Id.*

### 1. The United States must overcome a strong presumption against preemption in this case.

The United States must overcome a strong presumption against federal preemption of state law. *See, e.g., Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). This presumption is also especially strong when the relevant legislation concerns an area that has traditionally been

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

regulated by the states. *Altria*, 555 U.S. at 77; *Medtronic,* 518 U.S. at 485; *see also Rice*, 331 U.S. at 230.

When a preemption clause has only one fair and straightforward reading, the presumption against preemption falls away, *see, e.g.*, *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995). However, when, like here, the express preemption clause is ambiguous or could lead to multiple plausible interpretations, the presumption remains intact. In other words, if there is a fair and plausible reading through which an express clause does not preempt a state law, then courts will adopt the presumption against preemption. "When the *text of a pre[]emption clause* is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors preemption.'" *Altria*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)) (emphasis added).

In *Rice*, the U.S. Supreme Court considered the U.S. Warehouse Act, which was amended in 1931 to include an express preemption clause. *Rice*, 331 U.S. at 232. But the Court *still* applied a presumption against preemption: "We start with the *assumption* that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 230 (emphasis added).

Given the various disparate interpretations of the EPIA's preemption clause provided in this very case (and others) by the United States and defendants, the EPIA's explicit text is necessarily open to multiple interpretations. Thus, the widely accepted presumption against federal preemption of SB 174 remains in force here.

> **2.    The EPIA is a food inspection and identification law that neglects upstream, pre-harvest production practices.**

Beyond that presumption, the scope of a preemption statute is based on a "fair understanding of congressional purpose." *Medtronic*, at 485 (cleaned up). Congressional intent is

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

discerned from the language of the statute and its statutory framework. *Id.* at 486. This includes the "'structure and purpose of the statute as a whole' … as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the [federal] statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.*

The EPIA, like the FMIA, regulates egg and egg product inspection, rather than upstream egg production. *See Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 51-52 (1st Cir. 2025) (holding the FMIA does not preempt a Massachusetts law prohibiting the sale of inhumanely produced pork because the statute regulates meat inspection rather than meat production).

The intent of the EPIA is clear from its statutory language. The EPIA states, "[i]t is essential, in the public interest, that the health and welfare of consumers be protected by the adoption of measures prescribed herein for assuring that eggs and egg products … are wholesome, otherwise not adulterated, and properly labeled and packaged." 21 U.S.C. § 1031. Congress "provide[s] for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards for eggs … to prevent the movement or sale for human food, of eggs and egg products which are adulterated or misbranded…" 21 U.S.C. § 1032. The statute's purpose is therefore limited to preventing adulteration and ensuring the safety of egg products.

The EPIA's legislative history confirms that Congress's sole concern was consumer safety and confidence. In 1969, Assistant Secretary of Agriculture Richard E. Lyng explained that H.R. 16092 was intended to strengthen federal and state inspection programs, protect consumers, and support the egg products and shell egg industries. *See* Egg Products Inspection

19
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Act: Hearing Before the Committee on Agriculture and Forestry, 91st Cong. 35–7 (1969) (statement of Asst. Sec. Richard E. Lyng).

Lyng emphasized that while clean, sound shell eggs were generally safe, eggs that were cracked, leaking, dirty, or inedible posed a significant public health risk because they could carry Salmonella and other pathogens, especially when incorporated into liquid, frozen, or dried egg products. *Id.* This testimony confirms that Congress's intent was to regulate inspection and product safety—not farming methods. By establishing a federal inspection system, the EPIA ensured that only safe, wholesome, and properly processed egg products entered the marketplace, addressing gaps in state inspection programs and protecting both consumers and the industry. *See also* Egg Products Inspection Act: Hearing Before the Committee on Agriculture and Forestry, 91st Cong. 30-1 (1969) (statement of U.S. Sen. George D. Aiken) (explaining that the bill protects consumers and producers' markets by keeping "bad eggs" from slipping through inspection).

### 3.   The EPIA does not expressly preempt SB 174.

Plaintiff has failed to plausibly allege as a matter of law that SB 174 is preempted by the EPIA. Congress must have articulated a "clear" and "manifest" intent to preempt state law in order to supersede traditional state authority. *Rice*, 331 U.S. at 230. And when an express preemption clause is found, a court must determine the "substance and scope" of the displacement of state law that was intended by Congress. *Altria*, 555 U.S. at 76. Preemption only occurs when state and federal law are "irreconcilable." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

The EPIA's preemption clause provides that no state may "require the use of standards of quality, condition, weight, quantity, or grade which are in addition to, or different from the official Federal standards[.]" 21 U.S.C. § 1052(b). By this language, Congress intended to

20

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

maintain uniformity in grading and labeling of eggs and egg products to ensure consumer protections *while leaving other aspects of egg production* to the states. The words "*use of standards*" makes clear that preemption is limited to state laws imposing additional or alternative inspection and grading requirements. In other words, EPIA preemption concerns *the uniformity of standards*, not the actual egg quality or grade per se. *See* Egg Products Inspection Act: Hearing Before the Committee on Agriculture and Forestry, 91st Cong. 48 (1969) (statement of M.J. Chamberlain, Chairman of the Egg Committee of the Institute of American Poultry Industries) (explaining that the bill "will provide for uniformity through the establishment of official standards for quality, condition, quantity or grade and the prohibition of any requirements…inconsistent therewith").

Plaintiff has failed to plausibly allege that Michigan's laws conflict or are irreconcilable with this uniformity of standards mandate of the EPIA. Rather, SB 174 regulates what products can be sold within the state, instead of the grading or inspection of eggs. Compliance with the cage-free mandate does not require producers or distributors to modify labels (such that large eggs would become extra large, or vice-versa), change grade classifications (such that a Grade A egg would become a Grade B egg in Michigan, or vice versa), or sort eggs differently (such that broken eggs would become unbroken, or vice-versa) from the federal scheme.

Furthermore, the EPIA does not regulate how eggs are produced, or otherwise dictate production practices, on farms outside Michigan. Many states today impose variety of requirements on eggs sold within their borders that are distinct from the standards and classifications used by the EPIA—but such requirements are entirely lawful, because easily coexist with the EPIA's own requirements.

For example, Iowa requires that labels on whole eggs in cartons "shall be printed in letters not less than ¼ inch in height, or plainly and conspicuously stamped or marked in letters not less than ½ inch in height." Iowa Admin. Code r. 12-36.8(3). Meanwhile, South Carolina requires that "[l]etters [for 'grade and size'] shall be not less than 5/16 inch in height. Also, packer's or distributor's name and address letters not less than 1/8 inch in height." S.C. Code Regs. § 5-228(1).  Both Iowa and South Carolina regulate in-state labeling in ways that are inconsistent with each other's laws. Yet, clearly, neither is preempted by the EPIA. This is because neither requires the use of alternative or additional identification schemes, standards, grades, or similar measures. They also do not undermine the uniformity of standards mandated by the EPIA.

SB 174 is perfectly consistent with how other states, like Iowa and South Carolina above, regulate eggs without triggering preemption. SB 174 regulates the conditions of production without altering grading, inspection, or labeling standards. Like other states, Michigan's law operates alongside federal requirements, demonstrating that state regulations and the EPIA can coexist.

Courts have interpreted the EPIA and similar federal inspection statutes narrowly, preempting only directly conflicting state laws that impose alternative standards on the product itself. In *Triumph Foods, LLC v. Campbell*, the First Circuit emphasized that the FMIA preempts only state laws that interfere with federal inspection standards. 156 F.4th at 51-52. Laws affecting production methods or other non-inspection aspects do not trigger preemption. So the First Circuit found that the Massachusetts Act "regulates pork production, rather than pork inspection" and that the "FMIA regulates only the latter," ultimately dismissing the preemption challenge. *Id.* at 52.

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

The issue here is analogous. SB 174 addresses hen housing and production conditions, not egg inspection, grading, or labeling, and therefore does not conflict with the EPIA.

## V.    Conclusion

For the reasons set forth above, the Center for a Humane Economy and Animal Wellness Action respectfully request that the Court grant this motion and dismiss Plaintiff's complaint.

Dated April 9, 2026.

s/Kate Chupka Schultz
Kate Chupka Schultz
OR No. 221174
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org

s/Oday Salim
Oday Salim
Mich. Bar No. P80897
University of Michigan Law School
Environmental Law & Sustainability Clinic
701 S. State St., Jeffries Hall 3018
Ann Arbor, MI 48109
(734) 763-7087
osalim@umich.edu

*Attorneys for Defendant-Intervenors the Center for a Humane Economy and Animal Wellness Action*

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Center for a Humane Economy and Animal Wellness Action, certifies that this brief contains 4,912 words, which complies with the word limit set by this Court's order on April 6, 2026, ECF No. 22, PageID.237-38. Microsoft Word (Microsoft 365 MSO, Version 2509) was used to generate this word count.

<u>s/ Kate Chupka Schultz</u>
Kate Chupka Schultz

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS