BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch
JOHN BAILEY
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
  950 Constitution Ave. NW
  Washington, D.C. 20005
  Telephone: (202) 514-6993
  Facsimile: (202) 514-8071
  E-mail: John.Bailey@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF MICHIGAN; TIMOTHY BORING, in his Official Capacity as Director of the Michigan Department of Agriculture and Rural Development; and DANA NESSEL, in her Official Capacity as Attorney General of Michigan.<br><br>Defendants. | No. 26-CV-00246<br><br>Hon. Jane M. Beckering<br>United States District Judge<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff, the United States of America, brings this civil action for declaratory and injunctive relief, and alleges as follows:

### INTRODUCTION

1.      The United States is facing a serious and sustained cost-of-living crisis.  Overly burdensome and unnecessary regulations have diminished the purchasing power and prosperity of the American worker.  These regulatory costs are borne most acutely by families purchasing essential goods, including food.

2.      As a result, President Trump declared that it shall be the policy of the United States to eliminate the "crushing regulatory burden" that has "made necessary goods and services scarce." Presidential Memorandum, *Delivering Emergency Price Relief for American Families and Defeating the Cost-of-Living Crisis* (Jan. 20, 2025).

3.      The State of Michigan has contributed to the historic rise in egg prices by imposing unnecessary red tape on the interstate market for eggs.  At issue here is Michigan's ban on selling eggs that fail to meet certain state-imposed criteria ("Sales Ban").  More specifically, this action challenges a 2019 Michigan law that prohibits the sale in Michigan of eggs produced by hens that do not meet Michigan's preferred housing requirements—even when those eggs are produced entirely outside the State and otherwise comply with all applicable federal standards.

4.      Michigan's imposition of state-specific egg quality standards has raised prices for American consumers.  By design and effect, Michigan's ban on noncompliant eggs restricts supply and increases compliance costs, contributing to higher prices for American families.

5.      Regardless of the intent or effect of Michigan's Sales Ban, it is the prerogative of the federal government alone to regulate the quality and inspection of eggs in interstate commerce.

6.      In 1970, Congress confronted the patchwork of state regulations governing eggs and egg products by passing the Egg Products Inspection Act (EPIA), 21 U.S.C. 1031 *et seq.*  The EPIA does not hint, but states outright, that its purpose is to establish "uniformity of standards for eggs" moving in interstate commerce.  *Id.* § 1032.

7.      Through the EPIA, Congress exercised its authority under the Supremacy Clause to expressly preempt state or local laws which impose quality standards "in addition to" or "different from" those contained in the EPIA.

8       Michigan's Sales Ban disregards that instruction.  Michigan's prohibition on selling eggs with certain disqualifying characteristics operates as a substantive standard on eggs themselves—one that disqualifies a category of eggs from interstate commerce based on state-imposed criteria that federal law does not recognize.  The Supremacy Clause does not permit such supplementary state regulation.  The EPIA expressly preempts Michigan's efforts to inflate egg prices by conditioning market access on non-federal egg standards.  The Sales Ban is therefore invalid.

9.      The United States thus seeks a declaration invalidating and permanently enjoining the enforcement of certain provisions of Michigan law that violate the EPIA and the Supremacy Clause, and that have raised the price of eggs for American families.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 21 U.S.C. § 1050 and 28 U.S.C. §§ 1331 and 1345.

11.      The United States has standing to vindicate its sovereign interests.  *Arizona v. United States*, 567 U.S. 387 (2012); *see Tennessee v. Dep't of Educ.*, 104 F.4th 577, 595 (6th Cir. 2024) (recognizing sovereign interest "in enforcing . . . duly enacted laws without contradiction from" another sovereign).  The United States' sovereign interests include ensuring that State laws do not interfere with federal law, or with the federal government's exclusive authority over interstate commerce.

12.      Congress created an express cause of action for the United States to enforce the EPIA's provisions, directing that "[a]ll proceedings for the enforcement or to restrain violations of [the EPIA] shall be by and in the name of the United States."  21 U.S.C. § 1050.

13.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and because a substantial part of the acts giving rise to this suit occurred within the District.

14.     This Court has authority to provide the relief requested under 21 U.S.C. § 1050; the Supremacy Clause, U.S. Const. art. VI, cl. 2; 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent legal and equitable powers.

## PARTIES

15.     Plaintiff is the United States of America, suing on its own behalf to vindicate its sovereign interests.

16.     Defendant State of Michigan is a state of the United States.

17.     Defendant Dr. Timothy Boring is sued in his official capacity as the Director of the Michigan Department of Agriculture and Rural Development (MDARD), which is a State of Michigan regulatory entity responsible for enforcing Senate Bill 174.

18.     Defendant Dana Nessel is sued in her official capacity as the Attorney General of Michigan.  The Attorney General is statutorily authorized to seek injunctive relief against any act in violation of SB 174.

## FEDERAL LAW

19.     Since 1946, Congress has consistently legislated in favor of nationally uniform standards for agricultural products.  *See, e.g.*, 7 U.S.C. § 1622(c) (directing the Secretary of Agriculture "[t]o develop and improve standards of quality, condition, grade, and packaging . . . in order to encourage uniformity and consistency in commercial practices.").

20.     In 1970, Congress provided for uniform national quality standards for eggs, in particular, by passing the EPIA, 21 U.S.C. § 1031 *et seq.*

21.     The federal EPIA governs the protection of human health in connection with the quality and inspection of shell eggs.  Section 1031, titled "Congressional statement of findings," provides that:

3

> It is essential, in the public interest, that the health and welfare of consumers be protected by the adoption of measures prescribed herein for assuring that eggs and egg products distributed to them and used in the products consumed by them are wholesome, otherwise not adulterated, and properly labeled and packaged.

22.    In addition to protecting public health, Congress through the EPIA sought to promote free and unhindered commerce in the interstate market for eggs.  The EPIA provides that "regulation by the Secretary of Agriculture . . . and cooperation by the States . . . are appropriate to prevent and eliminate burdens upon [interstate] commerce."  21 U.S.C. § 1031.  In passing the EPIA, Congress saw the need to "insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce."  H.R. Rep. No. 91-1670 at 66, 1970 WL 5922, at *5246 (Dec. 3, 1970).

23.    To achieve these twin aims, the EPIA provided for uniform national market standards for eggs, and it expressly preempted any state or local standards for eggs that differ from or add to federal standards.  The EPIA declares "the policy of the Congress to provide for . . . uniformity of standards for eggs."  21 U.S.C. § 1032.

24.    Most critically, Section 1052(b) of the EPIA contains an express preemption provision that invalidates state laws intended to regulate the quality or condition of eggs.  It provides: "For eggs which have moved or are moving in interstate or foreign commerce, . . . no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are *in addition to or different from* the official Federal standards[.]"  21 U.S.C. § 1052(b)(1) (emphasis added).

25.    This language "sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the [EPIA]." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (examining materially similar preemption clause in the Federal Meat Inspection Act).

26.    Congress delegated to the Secretary of Agriculture broad authority to issue "such rules and regulations as he deems necessary to carry out the purposes or provisions of" the EPIA. 21 U.S.C. § 1043.

4

27.    Exercising that authority, the Secretary has codified the EPIA's express preemption provision in a federal regulation that provides, "[f]or eggs that moved or are moving in interstate or foreign commerce, no State or local jurisdiction . . . [m]ay require the use of standards of quality, condition, grade, or weight classes which are in addition to or different than the official standards[.]"  7 C.F.R. § 57.35(a)(1).

28.    Although the terms "condition" and "quality" are not defined within the EPIA, the Secretary has expansively defined both terms for purposes of part 57.  Relevant here:

> Condition means any characteristic affecting a product[']s merchantability including, but not being limited to, . . . [t]he state of preservation, cleanliness, soundness, wholesomeness, or fitness for human food of any product; or the processing, handling, or packaging which affects such product.
> . . .
> Quality means the inherent properties of any product which determine its relative degree of excellence.

*Id.* § 57.1.

29.    Taken together, the EPIA and its implementing regulations establish a comprehensive federal scheme governing the quality and condition of eggs in interstate commerce, leaving no room for States to impose additional or different egg standards as a condition of sale. Any state law that disqualifies eggs from interstate commerce based on non-federal criteria runs afoul of the EPIA.

## MICHIGAN LAW

### A.  Michigan's Animal Housing Laws

30.    In 2009, Michigan passed House Bill 5127 (HB 5127).  HB 5127 amended Michigan's Animal Industry Act of 1988 with prescribed requirements for housing covered farm animals, including egg-laying hens, within Michigan.  These requirements were intended "to reassure the public about the quality of Michigan's meat, milk, and eggs[.]"[1]

---

[1] House Legislative Analysis, A Summary of House Bill 5127 As Enrolled (Feb. 2, 2011), available at https://legislature.mi.gov/documents/2009-2010/billanalysis/House/pdf/2009-HLA-5127-6.pdf

31.    HB 5127 provides that "a farm owner or operator shall not tether or confine any covered animal [including egg-laying hens] on a farm for all or majority of any day, in a manner that prevents such animal from . . . (a) Lying down, standing up, or fully extending its limbs [or] (b) Turning around freely."  HB 5127 § 46(2).

32.    "In the case of egg-laying hens, fully extending it limbs means fully spreading both wings without touching the side of an enclosure or other egg-laying hens and having access to at least 1.0 square feet of usable floor space per hen."  HB 5127 § 46(1)(g).  As for "turning around freely," that means "turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal."  *Id.* § 46(1)(j).

33.    With respect to egg-laying hens, HB 5127's requirements were not effective until October 2019.  *See* HB 5127 § 46(7) ("The provisions of this section do not apply to egg-laying hens . . . until 10 years after the enactment date of the amendatory act that added this section.").

34.    In 2019, Michigan passed Senate Bill 174 (SB 174), which (among other things) amended and added to the animal housing requirements set initially by HB 5127.

35.    SB 174 retained HB 5127's prohibition on housing covered animals in a manner that prevents the animal from either "[t]urning around freely" or "[l]ying down, standing up, or fully extending its limbs."  *See* SB 174 § 46(2)(a)(i)-(ii).

36.    SB 174 also imposed new requirements specific to egg-laying hens.  In particular, it prohibited farmers from housing hens "in an enclosure other than a cage-free housing system."  *Id.* § 46(2)(b)(i).  This operated as a ban on all enclosure types "commonly described as battery cages, colony cages, enriched cages, or enriched colony cages, or any cage system similar to those systems."  *Id.* § 46(1)(b)(iv), (2)(b)(i).

37.    To satisfy SB 174's definition of "cage-free housing system," an enclosure must meet several additional specifications.  For example, enclosures must "provide[] enrichments that allow the hens to exhibit natural behaviors," such as "scratch areas, perches, nest boxes, and dust bathing areas."  *Id.* § 46(1)(b)(ii).  Moreover, for indoor environments, a farm employee must be

6

"able to provide care to the hens while standing within the hens' usable floor space." *Id.* § 46(1)(b)(iii).

38.  Separately, SB 174 prohibited farmers from housing hens "[w]ith less than the amount of usable floor space per hen as provided in . . . [the] 'Animal Husbandry Guidelines for U.S. Egg-Laying Flocks,' 2017 edition, published by United Egg Producers." *Id.* § 46(2)(b)(ii). Those guidelines require:

    a.    providing a minimum of 1 square foot of usable floorspace per hen in multitiered aviaries and partially slatted systems;

    b.    providing a minimum of 1.5 square foot of usable floorspace per hen in single-level floor systems.

39.  SB 174 permits only narrow exclusions from its requirements.  It does not apply:

    a.    during "[s]cientific or agriculture research";

    b.    during veterinary examinations or treatment; or

    c.    during transportation, shows, or slaughter.

40.  The United States does not challenge Michigan's authority to impose animal-husbandry requirements on egg-laying hens raised within the state.

**B.  Michigan's Preempted Egg Quality Standards**

41.  In addition to imposing requirements on farmers, SB 174 (unlike HB 5127) separately bans the sale of eggs that fail to meet Michigan standards—even if those eggs were laid by hens raised entirely outside of Michigan.

42.  SB 174 provides that "a business owner shall not knowingly engage in the sale of any shell egg in this state that the business owner knows or should know is the product of an egg-laying hen that was confined in a manner that is inconsistent with the requirements [specified herein]."  SB 174 § 46(4) (codified at MICH. COMP. LAWS § 287.746(4)) (Sales Ban).  Thus, eggs cannot be sold in Michigan if they were laid by a hen that was ever confined in conditions that fail to satisfy Michigan law.

43.  Michigan has enforced, and continues to enforce, the Sales Ban.  As MDARD

explained in a published summary of SB 174, "[o]verall, the expectation from the Department is for business owners who are selling shell eggs subject to this law must obtain written confirmation from their suppliers that the eggs were produced in an environment that meets Michigan's cage-free requirements.  That confirmation should be made available upon request by the Department."[2]

44.    MDARD has also issued public guidance regarding implementation of SB 174 and the Sales Ban.  It explains that covered egg merchants "must obtain written confirmation from their suppliers that the eggs they received" were produced consistent with Michigan law, and "[t]hey must be able to show that documentation to an inspector when requested." [3]

45.    To "ensure the cage-free egg law is being followed," MDARD "performs routine inspections at locations selling shell eggs."  *Id.*   MDARD explains that "[c]age-free egg compliance will be rolled into MDARD's deeply established routine of inspections of food establishments, places where shell eggs are sold, and complaint investigations."  *Id.*  MDARD makes clear that it "will use its established progressive enforcement process to bring firms into compliance," including through the imposition of "fines and/or other regulatory actions."  *Id.* Enforcement extends to "all qualifying suppliers selling shell eggs in Michigan," regardless of whether they are located within Michigan.  *Id.*

46.    Relatedly, Michigan enforces the Sales Ban through a formal complaint process administered by MDARD.  *See id.* (explaining that suspected violations should be reported to MDARD via phone, email, or electronic complaint).  Members of the public can report suspected violations of the Sales Ban through an online complaint form.  *See* MDARD, Complaint Form, https://perma.cc/SXJ2-GS3E.

47.    Although SB 174's general housing requirements apply to any "covered animal"— defined as "a gestating sow, calf raised for veal, or egg-laying hen"—the Sales Ban applies only

---

[2] MDARD, Michigan Cage-Free Egg Law Summary, available at https://www.michigan.gov/mdard/-/media/Project/Websites/mdard/documents/food-dairy/laws/Cage-Free-Egg-Law-Summary.pdf

[3] MDARD, Cage-Free Egg Law (Public Act 132 of 2019) FAQ (FAQ), available at https://perma.cc/2DWT-P833

to shell eggs.  That is, SB 174 does not separately prohibit the sale of pork or veal that was produced in conditions that fail to satisfy Michigan requirements.  *See* MICH. COMP. LAWS § 287.746(1)(d), (2)(a).

48.  To enforce its requirements, SB 174 authorized both the Michigan Attorney General and Department of Agriculture and Rural Development to seek an injunction against any violative conduct.  *See* MICH. COMP. LAWS § 287.746(6); *see also id.* § 287.744(15).  A violation of SB 174 is also a misdemeanor offense punishable by a fine of not less than $300 or imprisonment of not less than 30 days, or both.  *See id.* § 287.744(11).  Moreover, the Michigan Director of Agriculture has authority to impose an administrative fine of up to $1,000 for each violation of SB 174.  *See id.* § 287.744(13)(b).

49.  SB 174 requirements pertaining to egg-laying hens and shell eggs became effective December 31, 2024.  *See id.* 287.746(9).

50.  Considering the civil and criminal penalties attached to a violation of the Sales Ban, Michigan's "deeply established routine of inspections," the State's public solicitation of complaints, as well as Michigan's vigorous defense of its law in litigation, regulated parties face ongoing coercive pressure to conform their conduct to Michigan's requirements.  At the least, regulated parties face a credible threat that Michigan will enforce its Sales Ban against violators.

## CLAIM FOR RELIEF

### COUNT ONE
### Violation of the Supremacy Clause – Preemption of SB 174's Egg Sales Ban

51.  Plaintiff incorporates by reference all allegations stated above.

52.  The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

53.     Under the Supremacy Clause, federal law expressly preempts state law where, as here, Congress acting within its constitutional authority expresses an intent to preempt state law through explicit statutory language.

54.     "Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024).  And when, as here, a "statute contains an express pre-emption clause," courts "do not invoke any presumption against pre-emption." *Puerto Rico v. Franklin Cal. Tax-free Trust*, 579 U.S. 115, 125 (2016).  The inquiry instead "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.*

55.     Congress' intent in passing the EPIA was plain: its purpose is to establish "uniformity of standards for eggs" moving in interstate commerce.  21 U.S.C. § 1032.  To that end, and in accordance with its power over interstate commerce and under the Supremacy Clause, Congress expressly pre-empted state and local laws "requir[ing] the use of standards of quality [or] condition" for eggs which are "in addition to or different from" federal standards.  21 U.S.C. § 1052(b).

56.     To enforce the EPIA, Congress created an express and exclusive cause of action for the United States, directing that "[a]ll proceedings for the enforcement or to restrain violations of [the EPIA] shall be by and in the name of the United States."  21 U.S.C. § 1050.

57.     The EPIA defines "official standards" to mean "the standards of quality, grades, and weight classes for eggs . . . under the Agricultural Marketing Act of 1946."  21 U.S.C. § 1033(r).   Since 1955, USDA's Agricultural Marketing Service (AMS) has promulgated standards, grades, and weight classes for shell eggs pursuant to that authority.  *See* 7 U.S.C. § 1622(c); 20 Fed. Reg. 667 (Feb. 1, 1955); USDA Agric. Mktg. Serv., *United States Standards, Grades, and Weight Classes for Shell Eggs*, AMS 56 (July 20, 2000).  To facilitate interstate commerce in eggs, Congress required that the AMS grading standards "encourage uniformity and consistency in commercial practices."  7 U.S.C. § 1622(c).

10

58.     In subsequently preempting state egg standards that add to or differ from the federal standards established by AMS, Congress through the EPIA statutorily mandated nationally uniform egg standards.  *See* 21 U.S.C. § 1052(b); *see also id.* § 1032.

59.     The Sales Ban is therefore invalid.  While Michigan may impose animal husbandry requirements on hens within its borders, its Sales Ban impermissibly imposes standards of quality and condition on eggs themselves.  That prohibition creates additional, or different, requirements for what constitutes safe, wholesome, and unadulterated eggs entering interstate commerce.  In other words, the Sales Ban functions as a preempted quality and condition standard because it forces merchants to sort, exclude, and differentiate among eggs based on criteria that federal law simply does not impose.

60.     The Sales Ban violates the EPIA and the Supremacy Clause by imposing requirements that are "in addition to" and "different from" federal egg standards, and is therefore invalid.

61.     The United States is suffering an ongoing injury to its sovereignty because the Sales Ban violates the EPIA and Supremacy Clause.  The United States has standing to assert this claim to protect its sovereign interests.  Michigan's enforcement, and threatened future enforcement, of the Sales Ban impairs the United States' "sovereign interest[] . . . [in] creat[ing] and enforc[ing] a legal code," as well as in having that code "recogni[zed]" by "other sovereigns."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).

62.     More specifically, the United States has a sovereign interest in vindicating Congress's policy to "provide for the . . . uniformity of standards for eggs."  21 U.S.C. § 1032.  Through implementation of the Sales Ban, Michigan requires merchants to use a state-specific standard of quality and condition that is absent from federal egg standards.  Thus, Michigan's enactment and enforcement of the Sales Ban does not merely transgress the EPIA's text—it directly undermines the federal government's codified interest in nationally uniform egg standards.

63.     Separately, Michigan's enactment and enforcement of the Sales Ban inflicts a sovereign injury on the United States by usurping exclusive federal authority.  "The power of

Congress to regulate interstate . . . commerce is exclusive and has no limitations other than such as arise from the Constitution itself." *Louisiana Pub. Serv. Comm. v. Texas & N.O.R. Co.*, 284 U.S. 125, 130 (1931).

64.    Congress through the EPIA sought to promote free and unhindered commerce in the interstate market for eggs and egg products.  The EPIA provides that "regulation by the Secretary of Agriculture . . . and cooperation by the States . . . as contemplated by this chapter . . . are appropriate to prevent and eliminate burdens upon [interstate] commerce."  21 U.S.C. § 1031. Congress saw the need to "insure uniformity of labeling, standards, and other provisions and enhance the free movement of eggs and egg products in interstate commerce."  H.R. Rep. No. 91-1670 at 66, 1970 WL 5922, at *5246 (Dec. 3, 1970).

65.    Michigan's enforcement of the Sales Ban burdens interstate commerce by increasing the regulatory burden on non-Michigan egg producers and distributors.

## PRAYER FOR RELIEF

For these reasons, the United States respectfully requests that this Court:

a)    Enter a judgment declaring that the Sales Ban (SB 174 § 46(4), now codified at MICH. COMP. LAWS § 287.746(4)) is expressly preempted by the EPIA, violates the Supremacy Clause, and is invalid;

b)    Permanently enjoin Defendants as well as their successors, agents, and employees from enforcing the Sales Ban (SB 174 § 46(4), now codified at MICH. COMP. LAWS § 287.746(4)).

c)    Award the United States its costs in this action; and

d)    Award any other relief it deems just and proper.

Dated:  April 27, 2026                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch

     /s/ *John Bailey*
JOHN BAILEY
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
U.S. Department of Justice
 950 Constitution Ave. NW
 Washington, D.C. 20005
 Telephone: (202) 514-6993
 Facsimile: (202) 514-8071
 E-mail: John.Bailey@usdoj.gov

Attorneys for Plaintiff
United States of America

13