RILEY SAFER HOLMES & CANCILA LLP
ARIEL WILSON (MSB P84528)
awilson@rshc-law.com
2723 South State Street, Suite 150
Ann Arbor, MI 48104
Telephone:  (734) 773-4910
Facsimile:  (734) 773-4901

BRUCE WAGMAN
bwagman@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA  94104
Telephone:  (415) 275-8540
Facsimile:  (415) 275-8551

*Counsel for Defendant-Intervenors
Humane World for Animals, Animal Legal
Defense Fund, Animal Equality, The Humane
League, Farm Sanctuary, Compassion in
World Farming, Inc., Animal Outlook*

REBECCA CARY
rcary@humaneworld.org
MELISSA ALPERT
malpert@humaneworld.org
HUMANE WORLD FOR ANIMALS
1255 23rd St., NW, Suite 450
Washington, D.C. 20037
Telephone:  (202) 676-2330
Facsimile:  (202) 676-2357

*Counsel for Defendant-Intervenor
Humane World for Animals*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MICHIGAN; TIMOTHY BORING, in his Official Capacity as Director of the Michigan Department of Agriculture and Rural Development; and DANA NESSEL, in her Official Capacity as Attorney General of Michigan,<br><br>Defendants, | Case No. 1:26-CV-00246-JMB-SJB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>The Honorable Jane M. Beckering<br><br>Action Filed: January 22, 2026 |

HUMANE WORLD FOR ANIMALS, et al.,

                    Defendant-Intervenors,

ANIMAL WELLNESS ACTION, et al.,

                    Defendant-Intervenors,

MICHIGAN ALLIED POULTRY
INDUSTRIES,

                    Defendant-Intervenors.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 2

III.    ARGUMENT ....................................................................................................... 3

        A.      The United States' Claims Are Non-Justiciable ....................................... 4

               1.     The United States Lacks Standing to Bring This Claim ............................ 4

               2.     The United States Already Represented to the Supreme Court That This Type of Law Is Not Preempted By the EPIA ............................................. 8

        B.      The Hen Enclosure Law Is Not Expressly Preempted ............................. 9

               1.     The EPIA Does Not Regulate Hen Enclosure Size ................................. 10

               2.     The Preemption Clause's Scope Is Limited to Egg-Grading Laws .......... 10

               3.     Egg-Grading Standards, Including Standards of "Quality" and "Condition," Concern Eggs' Physical Characteristics ............................ 12

               4.     The Hen Enclosure Law Is Not an Egg-Grading Law, and Does Not Impose "Standards of Quality, Condition, Weight, or Grade" on Eggs .... 14

        C.      The United States' Interpretation of the Preemption Clause Is Nonviable ........... 15

IV.    CONCLUSION ................................................................................................. 18

CERTIFICATE OF COMPLIANCE .......................................................................................... 19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
  870 F.3d 1140 (9th Cir. 2017) ...................................................................................10

*Cafarelli v. Yancy*,
  226 F.3d 492 (6th Cir. 2000) .....................................................................................16

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................................................4

*Cresenzi Bird Importers, Inc. v. New York*,
  658 F. Supp. 1441 (S.D.N.Y. 1987), *aff 'd* 831 F.2d 410 (2d Cir. 1987)................................10

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005).......................................................................................................12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................................4

*Mackinac Ctr. for Pub. Pol'y v. Cardona*,
  102 F.4th 343 (6th Cir. 2024) ......................................................................................5

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)..................................................................................................9, 17

*Missouri v. California*,
  586 U.S. 1065 (2019)............................................................................................ *passim*

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)...................................................................................................6, 10

*New Hampshire v. Maine*,
  532 U.S. 742 (2001).....................................................................................................9

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
  579 U.S. 115 (2016).....................................................................................................9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).....................................................................................................4

*Thompson v. Goetzmann*,
  337 F.3d 489 (5th Cir. 2003) .....................................................................................16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

*United States v. California*,
   No. 2:25-CV-06230, --- F.Supp.3d ----, 2026 WL 784514 (C.D. Cal. Mar. 18,
   2026) ........................................................................................................................ *passim*

*United States v. Michigan*,
   No. 1:25-CV-496, 2026 WL 194031 (W.D. Mich. Jan. 24, 2026) (Beckering,
   J.)..................................................................................................................................4

*Upside Foods Inc v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
   No. 24-13640, 2026 WL 797121 (11th Cir. 2026) ......................................................7

*Va. Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019)................................................................................................9, 15

*West Virginia v. Env't Prot. Agency*,
   597 U.S. 697 (2022)....................................................................................................18

**Statutes**

7 U.S.C. § 1622(c) .............................................................................................................11

21 U.S.C. §§ 1031 *et seq.*.........................................................................................2, 6, 10

21 U.S.C. § 1033(f)..............................................................................................................2

21 U.S.C. § 1033(g)..............................................................................................................2

21 U.S.C. § 1033(q)..............................................................................................................2

21 U.S.C. § 1033(r)..................................................................................................... *passim*

21 U.S.C. § 1034(a) ..............................................................................................................2

21 U.S.C. § 1034(d) ...........................................................................................................17

21 U.S.C. § 1035.................................................................................................................7

21 U.S.C. § 1036(b) .............................................................................................................7

21 U.S.C. § 1050.................................................................................................................7

21 U.S.C. §1052(b) ..................................................................................................... *passim*

21 U.S.C. § 1052(b)-(d) .....................................................................................................17

Ariz. Admin Code § R3-2-907...........................................................................................3

Cal. Health & Safety Code §§ 25990 *et seq.* .....................................................................3

Cal. Health & Safety Code § 25990(b)........................................................................3

Colo. Rev. Stat. § 35-21-201 ......................................................................................3

Colo. Rev. Stat. § 35-21-203 ......................................................................................3

Mass. Gen. Laws ch. 129 App. §§ 1-1–1-12 ..............................................................3

Mass. Gen. Laws ch. 129 App. § 1-3..........................................................................3

01-001 Code Me. R. ch. 213 .....................................................................................17

Md. Code Agric. § 4-310 ..........................................................................................17

Mich. Comp. Laws § 287.746....................................................................................10

Mich. Comp. Laws § 287.746(1)(b) ............................................................................2

Mich. Comp. Laws § 287.746(2)(b) ............................................................................2

Mich. Comp. Laws § 287.746(4)..................................................................................2

Nev. Rev. Stat. §§ 583.237–583.247 ..........................................................................3

Nev. Rev. Stat. § 583.245 ...........................................................................................3

N.Y. Comp. Codes R. & Regs. tit. 1, § 57.7.............................................................17

Ohio Admin. Code 901:12-9-03(F)(6).........................................................................3

Or. Rev. Stat. § 632.847(1) .........................................................................................3

Or. Rev. Stat. §§ 632.835–632.850.............................................................................3

R.I. Gen. Laws §§ 4-1.1-1–4-1.1-6.............................................................................3

Utah Code §§ 4-4a-101–4-4a-107 ..............................................................................3

Wash. Rev. Code § 69.25.110(4)................................................................................3

Wash. Rev. Code §§ 69.25.010– 69.25-930 ...............................................................3

**Regulations**

7 C.F.R. §§ 56.1 *et seq.*...........................................................................................13

7 C.F.R. § 56.1 ...............................................................................................12, 13, 14, 14

7 C.F.R. § 57.1 ...........................................................................................................11

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

7 C.F.R. § 57.35 ........................................................................................................11

21 C.F.R. § 118.12(d) ...............................................................................................17

**Court Rules**

Fed. R. Civ. P. 12(b)(1)...........................................................................................3, 4, 8

Fed. R. Civ. P. 12(b)(6)............................................................................................3, 9

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 356
     (2012)..................................................................................................................16

Amazon Fresh, *Amazon Fresh Animal Welfare Position* 3 (Dec. 2024),
     https://sustainability.aboutamazon.com/amazon-fresh-animal-welfare-
     position.pdf ...........................................................................................................3

D. R. Jones et al., *Influence of commercial laying hen housing systems on the
     incidence and identification of Salmonella and Campylobacter* Poultry Sci.
     1116 (2016)............................................................................................................3

European Food Safety Authority Panel on Biological Hazards, *Salmonella control
     in poultry flocks and its public health impact*, 17 EFSA J. 5596 (as amended
     Apr. 8, 2019), https://www.efsa.europa.eu/en/efsajournal/pub/5596 .....................3

FDA, *2022 Food Code* at 59, 88 (2022), https://www.fda.gov/food/fda-food-
     code/food-code-2022 ............................................................................................17

FDA, *Salmonella Enteritidis in Eggs*, 63 Fed. Reg. 27502 (May 19, 1998) ................17

H. Jeon et al., *Welfare Characteristics of Laying Hens in Aviary and Cage
     Systems* Poultry Sci., 104987 (2025) ......................................................................2

K.M. Hartcher & B. Jones, *The Welfare of Layer Hens in Cage and Cage-Free
     Housing Systems* World's Poultry Sci. J. 767-82 (2017) ..........................................2

McDonald's, *McDonald's Achieves Goal of Sourcing 100% Cage-Free Eggs in
     the U.S.* (Feb. 6, 2024), https://corporate.mcdonalds.com/corpmcd/our-
     stories/article/mcdonalds-achieves-goal-sourcing-100cagefree-eggs-us.html .........3

Sprouts, *2024 Impact Report* 13 (2025), https://www.sprouts.com/wp-
     content/uploads/2025/05/Sprouts-Impact-Report-2024_R.pdf..................................3

USDA AMS, *United States Standards, Grades, and Weight Classes for Shell
     Eggs*,
     https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Standard%5B1
     %5D.pdf............................................................................................... *passim*

v

*Webster's Third New International Dictionary* (1961) ...................................................................7

vi

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

The federal government seeks to invalidate Michigan's S.B. 174, an animal welfare law restricting the sale of eggs produced from cruelly-confined hens. But the only legal theory the United States relies on—preemption under section 1052(b) of the Egg Products Inspection Act ("EPIA")—is one that the United States already told the Supreme Court is meritless. *See Missouri v. California*, No. 22O148, Brief for the United States as Amicus Curiae (Nov. 29, 2018) ("Solicitor General Brief").[1] As the government itself already explained, this preemption clause only relates to state *egg-grading standards*, and does not prevent states from regulating in-state egg sales based on *hen housing conditions*. *Id.* at 7, 18-20.

The United States' claim here is both meritless and nonjusticiable. Its suit is part of a broader campaign against state laws that the current federal administration dislikes, and follows on the heels of its materially-identical lawsuit against California's materially-identical laws. The United States asserts a theory of standing already rejected in that suit: "sovereign injury" caused by the mere existence of an allegedly preempted state law. *United States v. California*, No. 2:25-CV-06230, --- F.Supp.3d ----, 2026 WL 784514 (C.D. Cal. Mar. 18, 2026). Among this theory's many deficiencies, it raises a serious "potential for abuse" that could enable the federal government to "initiate a campaign of preemption suits under the aegis of its sovereignty to bring state laws in line with its own political agenda." *Id.* at *4. This lawsuit is exactly the "abuse" the *California* Court predicted.

---

[1] Available at
https://www.supremecourt.gov/DocketPDF/22/22O148/73669/20181129155455478_Orig.%20148%20State%20of%20Missouri%20v.%20Cal.pdf.

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

## II.    BACKGROUND

S.B. 174 (the "Hen Enclosure Law" or the "Law") ensures that (i) Michigan's egg-laying hens are raised in "cage-free housing system[s]," with enrichment opportunities and a minimum amount of floor space per hen; and that (ii) eggs sold in-state come from hens raised under these minimum welfare standards. Mich. Comp. Laws §§ 287.746(1)(b), 287.746(2)(b), 287.746(4). This brief adopts by reference the State's summary of the Hen Enclosure Law, the EPIA (21 U.S.C. §§ 1031 *et seq.*), and the relevant prior litigation, including *United States v. California* and *Missouri v. California*.

Critically, the EPIA does not regulate on-farm welfare conditions for egg-laying hens. *See generally* 21 U.S.C. §§ 1031 *et seq.* It primarily establishes a system of United States Department of Agriculture ("USDA") inspection at "official plants" where "egg products" are produced, to ensure these egg products are not "misbranded or adulterated." 21 U.S.C. §§ 1033(q), 1034(a). "Egg products" are "any dried, frozen, or liquid eggs," *but not* "shell egg[s]." *Id.* §§ 1033(f), 1033(g). The Hen Enclosure Law regulates *only* shell eggs. Mich. Comp. Laws § 287.746(4).

The Hen Enclosure Law reflects growing public awareness of and opposition to cruel confinement of egg-laying hens in "battery cages": horrific wire contraptions used in conventional egg production that are so small the animals cannot turn around, lie down, flap their wings, or express natural behaviors.[2] The Law bans this cruel confinement, and bans the sale of eggs produced under these cruel conditions. Numerous other states have passed similar laws

---

[2] *See, e.g.*, K.M. Hartcher & B. Jones, *The Welfare of Layer Hens in Cage and Cage-Free Housing Systems*, 73 World's Poultry Sci. J. 767-82 (2017); H. Jeon *et al.*, *Welfare Characteristics of Laying Hens in Aviary and Cage Systems*, 104 Poultry Sci., 104987 (2025).

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

banning cruel hen confinement,[3] and banning the in-state sale of cruelly-produced eggs.[4]

Consumer awareness of the cruelty of battery cages has also prompted numerous companies to

commit to cage-free sourcing.[5] Battery cages are not just cruel, but also hotbeds of dangerous

pathogens: some studies have shown that battery-caged hens' eggs have the highest rates of

*Salmonella* contamination among all egg-production systems.[6]

## III.    ARGUMENT

The First Amended Complaint ("FAC") should be dismissed under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). The United States does not plausibly allege Article III standing

to sue; its bare "sovereign injury" theory of standing was already rejected in its parallel suit

against California. *California*, 2026 WL 784514, at *2-5. And the United States cannot plausibly

allege EPIA preemption; to the contrary, it already represented to the Supreme Court that the

*same* preemption clause *did not* preempt a materially-identical cage-free law. Solicitor General

Brief at 18-20. That preemption clause only bans state laws "requir[ing] the use of standards of

---

[3] Ariz. Admin Code § R3-2-907; Cal. Health & Safety Code §§ 25990 *et seq.*; Colo. Rev. Stat. § 35-21-201; Mass. Gen. Laws ch. 129 App. §§ 1-1–1-12; Nev. Rev. Stat. §§ 583.237–583.247; Ohio Admin. Code 901:12-9-03(F)(6); Or. Rev. Stat. §§ 632.835–632.850; R.I. Gen. Laws §§ 4-1.1-1–4-1.1-6; Utah Code §§ 4-4a-101–4-4a-107; Wash. Rev. Code §§ 69.25.010– 69.25-930.

[4] Ariz. Admin. Code § R3-2-907; Cal. Health & Safety Code § 25990(b); Colo. Rev. Stat. § 35-21-203; Mass. Gen. Laws ch. 129 App. § 1-3; Nev. Rev. Stat. § 583.245; Or. Rev. Stat. § 632.847(1); Wash. Rev. Code § 69.25.110(4).

[5] *See, e.g.*, McDonald's, *McDonald's Achieves Goal of Sourcing 100% Cage-Free Eggs in the U.S.* (Feb. 6, 2024), https://corporate.mcdonalds.com/corpmcd/our-stories/article/mcdonalds-achieves-goal-sourcing-100cagefree-eggs-us.html; Sprouts, *2024 Impact Report* 13 (2025), https://www.sprouts.com/wp-content/uploads/2025/05/Sprouts-Impact-Report-2024_R.pdf; Amazon Fresh, *Amazon Fresh Animal Welfare Position* 3 (Dec. 2024), https://sustainability.aboutamazon.com/amazon-fresh-animal-welfare-position.pdf.

[6] *See, e.g.*, European Food Safety Authority Panel on Biological Hazards, *Salmonella control in poultry flocks and its public health impact*, 17 EFSA J. 5596 at 47-48, 68 (as amended Apr. 8, 2019), https://www.efsa.europa.eu/en/efsajournal/pub/5596; D. R. Jones et al., *Influence of commercial laying hen housing systems on the incidence and identification of Salmonella and Campylobacter*, 95 Poultry Sci. 1116 (2016).

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards"—which the EPIA defines as the federal egg-grading standards. 21 U.S.C. §§ 1052(b), 1033(r). The Hen Enclosure Law does no such thing; it regulates in-state egg sales based on hen enclosure size, a subject entirely beyond the EPIA's scope.

### A.      The United States' Claims Are Non-Justiciable

The FAC should be dismissed under Rule 12(b)(1). It articulates no viable basis for Article III standing and raises serious separation-of-powers concerns.

### 1.      The United States Lacks Standing to Bring This Claim

Plaintiff "bears the burden of establishing" that it has Article III standing to sue: an injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "Article III standing . . . is built on separation-of-powers principles, [and] serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The federal government is not immune from this standing requirement. *See, e.g. United States v. Michigan*, No. 1:25-CV-496, 2026 WL 194031, at *11 (W.D. Mich. Jan. 24, 2026) (Beckering, J.); *California*, 2026 WL 784514, at *2.

The FAC identifies no "concrete and particularized" harms to the federal government caused by the Hen Enclosure Law. *See Lujan*, 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (to be concrete, an injury "must actually exist," and be "real," not "abstract") (internal quotations omitted). It does not allege that the Law has impeded any federal operations or functions, caused any federal diversion of resources, or increased any federal costs. *See generally* FAC. Instead, it alleges the Law, and related regulations, are enforced against *egg merchants* and *egg suppliers*, *i.e.* "regulated parties." FAC ¶¶ 43-46, 50, PageID.387-89. But the United States does not allege that *it* is a "regulated party." "A party faces an uphill battle in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

establishing standing if it 'is not [it]self the object of the government action or inaction' at issue." *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) (quoting *Lujan*, 504 U.S. at 562).

Instead of identifying actual harm, the United States asserts an amorphous sovereign injury, alleging it "suffer[s] an ongoing injury to its sovereignty because the [Law] violates the EPIA and Supremacy Clause." FAC ¶ 61, PageID.391. But this "sovereign injury" standing theory is not cognizable and was recently rejected in *United States v. California*, the government's materially-identical suit against California's materially-identical cage-free laws. *California*, 2026 WL 784514, at *2-6. As the *California* Court explained, "the mere existence of a preempted state law" does not "create[ ] a sovereign injury to the federal government." *Id*. at *3. The Supremacy Clause "'provides a rule of decision,' not 'an independent grant of legislative power to Congress'[;]" and it does not create "a substantive right that Congress or the United States may vindicate through suit." *Id*. at *4 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018)).

The United States' attempt to reframe this "sovereign injury" as a "sovereign interest in vindicating Congress's [alleged] policy to" provide "uniform[ ] . . . standards for eggs," or to "promote free and unhindered commerce in" eggs, *see* FAC ¶¶ 62, 64, PageID.391-92, repeats the error. Regardless of the accuracy of these policy claims—and they are meritless, for the reasons explained *infra* §§ III.B–C—they are still mere legal conclusions that fail to identify any actual, concrete harm to any federal function. For this reason, the government fails to plausibly allege injury-in-fact. *See California*, 2026 WL 784514, at *3.

The FAC's bare allegations regarding interstate commerce, untethered to any harm to the United States, fail for the same reasons. FAC ¶¶ 63-65, PageID.391-92.  Moreover, the Supreme

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Court already held that a state sales ban on cruelly-produced animal products does not run afoul of the dormant Commerce Clause: "[i]n our interconnected national marketplace, many (maybe most) state laws have" impacts outside the state. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023). The bald claim that the EPIA "promote[s] free and unhindered commerce in the interstate market for eggs and egg products," FAC ¶ 64, PageID.392, mischaracterizes the law—which imposes *restrictions* on the commercial sale of eggs and egg products—and ignores the preemption clause's savings clause permitting non-conflicting state regulations. *See* 21 U.S.C. §§ 1031 *et seq.*; *id*. § 1052(b).

Moreover, as the *California* Court warned, the government's "sovereign injury" standing theory threatens fundamental principles of federalism:

> [S]uppose the executive or the decisionmakers at the Department of Justice simply do not like a state law because it is in tension with their policies. Without requiring the United States to show some redressable injury, the federal government might initiate a campaign of preemption suits under the aegis of its sovereignty to bring state laws in line with its own political agenda. The potential for abuse of the federal courts for political purposes is manifest. Standing doctrine provides a valuable safeguard.

*California*, 2026 WL 784514, at *4. The United States' decision to sue Michigan here, shortly after suing California over its cage-free law, is a stark example of this risk.

The United States' theory of injury is also implausible. As explained further *infra* § III.A.2, the Supreme Court already asked the United States, under President Trump, to opine on the constitutionality of cage-free laws in *Missouri v. California*, where states sued to invalidate California's materially-identical cage-free laws. Solicitor General Brief. The United States represented that the laws were *not* preempted by the EPIA, and therefore urged the Court to *decline* to hear plaintiffs' challenge. *Id.* at 18-20. If state cage-free laws injure federal sovereignty, surely the United States would have mentioned this to the Supreme Court—or would have sued to remedy the injury in the many years since such laws were first enacted.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

The EPIA's provision at 21 U.S.C. § 1050, stating that "[a]ll proceedings for the enforcement or to restrain violations of [the EPIA] shall be by and in the name of the United States," is irrelevant. *See* FAC ¶¶ 10, 12, PageID.382. This lawsuit is not an "enforcement" "proceeding." As explained in *California*, the EPIA regulates *individuals*, not *states*. *California*, 2026 WL 784514, at *4 ("'[T]he Constitution confers upon Congress the power to regulate individuals, not States'"; therefore, while "preemption provisions like 21 U.S.C. § 1052(b) 'might appear to operate directly on the States' based on their phrasing, . . . they instead should be read to 'confer[ ] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints.'") (quoting *Murphy*, 584 U.S. at 477-79). Only regulated persons—not states—can commit "violations of [the EPIA]" prosecutable under this provision. The Eleventh Circuit recently reached the same conclusion regarding the Poultry Products Inspection Act's ("PPIA's") near-identical provision:

> Section 467c says that only the United States may enforce or restrain violations of the PPIA. The PPIA regulates poultry processors, not state actors. . . . The ordinary meanings of the terms "enforce" ("to put in force"), "restrain" (to "prevent from doing something"), and "violation" ("an infringement or transgression") are not broad enough to cover a lawsuit like this one that seeks to stop state officers, not from breaking the PPIA, but from enforcing a state law. *Webster's Third New International Dictionary* 751, 1936, 2554 (1961).

*Upside Foods Inc v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, No. 24-13640, 2026 WL 797121, at *8 (11th Cir. 2026). Moreover, because the government does not allege that the Hen Enclosure Law requires Michigan to engage in any conduct prohibited by the EPIA—*e.g.*, maintaining unsanitary egg product processing plants, or using misleading egg product labels, 21 U.S.C. §§ 1035, 1036(b)—its suit cannot be characterized as an enforcement proceeding.

Because the FAC alleges no actual injury, and relies on a theory of standing that is both legally incognizable and implausible, it must be dismissed under Rule 12(b)(1).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

### 2.    The United States Already Represented to the Supreme Court That This Type of Law Is Not Preempted By the EPIA

In *Missouri v. California*, the United States, under President Trump, advised the Supreme Court that California's materially-identical cage-free laws were not preempted by the EPIA—and recommended the Court decline to hear petitioners' challenge to the laws. Solicitor General Brief at 7, 18-20. It stated unequivocally that California's laws "are not preempted by the EPIA, because USDA's egg-grading standards do not address confinement conditions for egg-laying hens." *Id*. at 7. And its brief debunked every argument presented in the FAC, explaining:

(1)    "[T]he California Egg Laws are not preempted by the federal statute that plaintiffs invoke, 21 U.S.C. 1052(b)."

(2)    The relevant "official Federal standards" in 21 U.S.C. 1052(b) are the "'official standards'" defined at 21 U.S.C. 1033(r): "'the standards of quality, grades, and weight classes for eggs * * * under the Agricultural Marketing Act of 1946,' . . . —that is, the Agricultural Marketing Service's grading standards."

(3)    "The Agricultural Marketing Service's standards are used to assess individual shell eggs and packages of eggs, so that most below-grade eggs are not sold to consumers and so that eggs can be sorted into batches of similar quality and size for commercial purposes."

(4)    "[T]the California Egg Laws do not impose any additional or different assessment standards of that kind."

(5)    "Agricultural Marketing Service's standards do not regulate the size of cages for egg-laying hens on farms."

*Id.* at 18-20. Consistent with the United States' argument, the Supreme Court declined to exercise jurisdiction. *Missouri v. California*, 586 U.S. 1065 (2019).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

The FAC makes no mention of this previous representation and offers no explanation for the United States' blatant flip-flop. Principles of estoppel bar litigants from "playing fast and loose with the courts" by asserting a position in one case that directly contradicts its previous position in another. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotations and citations omitted). As exemplified here, such opportunism threatens "the integrity of the judicial process," *id.* at 749 (internal quotations and citations omitted), and invites serious "potential for abuse of the federal courts for political purposes," *California*, 2026 WL 784514, at *4.

### B.     The Hen Enclosure Law Is Not Expressly Preempted

The FAC also fails to state a plausible claim for relief under Rule 12(b)(6), because the Hen Enclosure Law falls outside the plain text of the EPIA's preemption clause. "The preemption of state laws represents 'a serious intrusion into state sovereignty.'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (Gorsuch, J.) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996)). Congressional purpose is "the ultimate touchstone" in preemption analysis, and "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Lohr*, 518 U.S. at 485-86 (internal quotations omitted). Where Congress has included an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (internal quotation and citation omitted).

The EPIA's preemption clause only bars a narrow category of state laws: those that "require the use of standards of quality, condition, weight, quantity, or grade" for "eggs," "which are in addition to or different from the official Federal standards." 21 U.S.C. § 1052(b). The official federal "standards of quality" at issue in this preemption clause are the federal egg-

9

grading standards, which sort eggs based on physical characteristics. *Infra* § III.B.2. The EPIA does not prevent states from regulating in-state egg sales based on hen enclosure size: it does not regulate hen enclosure size at all. *See generally* 21 U.S.C. §§ 1031 *et seq.*

### 1. The EPIA Does Not Regulate Hen Enclosure Size

The FAC identifies no EPIA provision regulating hen enclosure size, and none exists. *See generally* FAC; 21 U.S.C. §§ 1031 *et seq*. Instead, on-farm animal welfare and animal cruelty have historically been regulated by states. *See Ross*, 598 U.S. at 365 (noting "States . . . have long enacted laws aimed at protecting animal welfare" and citing Massachusetts' ban on the in-state sale of cruelly-produced pork); *Cresenzi Bird Importers, Inc. v. New York*, 658 F. Supp. 1441, 1447 (S.D.N.Y. 1987), *aff'd* 831 F.2d 410 (2d Cir. 1987) ("The State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical"); *cf. Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1148 (9th Cir. 2017) (quoting USDA representation that it "has no authority to regulate the care or feeding of birds prior to their arrival at the slaughter facility" under the PPIA).

Consistent with this historical practice, the Hen Enclosure Law addresses farm animal welfare by establishing a minimum hen enclosure size for Michigan farmers and for eggs sold in-state. Mich. Comp. Laws § 287.746. It is undisputed that Michigan can regulate hen enclosure size without implicating the EPIA. *See* FAC ¶¶ 40, 59, PageID.387, 391 ("Michigan may impose animal husbandry requirements on hens within its borders . . ."). The United States' assertion that Michigan's husbandry provision should be treated differently than its husbandry-based sales provision ignores that both provisions fall outside the EPIA's scope.

### 2. The Preemption Clause's Scope Is Limited to Egg-Grading Laws

As the United States has acknowledged, *supra* § II.A.2, the EPIA's preemption clause only encompasses state egg-grading laws. It bans state laws requiring the "use of standards" that

10

add to or differ from "official Federal standards." 21 U.S.C. § 1052(b). The EPIA defines these "official standards" to mean "the standards of quality, grades, and weight classes for eggs, in effect upon the effective date of this chapter, or as thereafter amended, under the Agricultural Marketing Act of 1946 [("AMA")]." *Id.* § 1033(r); *see also* FAC ¶ 57, PageID.390; 7 C.F.R. §§ 57.1 & 57.35 (EPIA regulations' preemption clause using similar definition of "official standards"). The AMA directs the USDA to set "standards of quality, condition, quantity, grade, and packaging" for agricultural products. 7 U.S.C. § 1622(c). Under this authority, the USDA established a voluntary federal egg-grading program, with standards reflected in the *United States Standards, Grades, and Weight Classes for Shell Eggs*. USDA AMS, *United States Standards, Grades, and Weight Classes for Shell Eggs*, AMS 56 (July 20, 2000) ("*United States Standards*").[7] The United States acknowledges that these are the operative federal "standards" at issue in the preemption clause. *See* FAC ¶¶ 57-58, PageID.390-91.

The federal egg-grading standards categorize eggs based on physical attributes, such as size, shell condition, and the interior quality of whites and yolks. *See generally United States Standards*. They sort eggs into AA, A, or B Quality, based on these kinds of tangible, apparent characteristics. *Id.* §§ 56.200-56.203. Egg Grades of AA, A, and B are determined by the percentage of eggs in a lot that meet "AA Quality," "A Quality," or "B Quality" standards. *Id.* §§ 56.216-56.217. These standards thereby "establish a basis for quality and price relationship and enable more orderly marketing" of shell eggs, so that "[c]onsumers can purchase officially graded product[s] with the confidence of receiving quality in accordance with the official identification." *Id.* at Foreword. In this way, they fulfill the goal the FAC identifies: "provid[ing]

---

[7] Available at
https://www.ams.usda.gov/sites/default/files/media/Shell_Egg_Standard%5B1%5D.pdf.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

for uniform national quality standards for eggs." *See* FAC ¶¶ 20, 22 PageID.383-84; *see also* Solicitor General Brief at 18-19.

The text of the preemption clause confirms this interpretation. It does not ban every state law that differs from or adds to the official federal standards; it only bans state "use of standards of quality, condition, weight, quantity, or grade" that differ from or add to those standards. 21 U.S.C. § 1052(b). This is a term of art, employing a parallel construction to the "federal standards" definition. *See* 21 U.S.C. § 1033(r) ("'official standards'" "means the standards of quality, grades, and weight classes for eggs . . ."); *see also* 7 C.F.R. § 56.1 (egg "[g]rading" is "[t]he act whereby a grader determines . . . the class, quality, quantity, or condition of any product . . ."). The clause therefore only encompasses state laws falling into this same category of "standards of quality, condition, [etc.]": egg-grading laws. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("identical words used in different parts of the same statute are generally presumed to have the same meaning").

### 3. Egg-Grading Standards, Including Standards of "Quality" and "Condition," Concern Eggs' Physical Characteristics

The federal egg-grading standards, contained in the *United States Standards*, are directed at and characterize shell eggs based on eggs' physical (*i.e.*, observable, tangible, readily apparent) characteristics. Indeed, egg "[g]rading" is defined as "[t]he act whereby a grader determines, according to the regulations in this part, the class, quality, quantity, or condition of any product *by examining each unit thereof or each unit of the representative sample thereof drawn by a grader and issues a grading certificate with respect thereto.*" 7 C.F.R. § 56.1 (emphasis added). Egg-grading characteristics thus can be determined by the naked eye. The *United States Standards* similarly categorize eggs based on physical conditions that can be readily observed, like size, shell color, and "the apparent condition of the interior contents of the

12

egg [(*i.e.* white and yolk)] as it is twirled before the candling light." *See generally United States Standards*; *see id.* at § 56.200; *see also* 7 C.F.R. §§ 56.1 *et seq.* (voluntary egg-grading regulations).

It is clear that each term in the phrase "standards of quality, grades, and weight classes for eggs" specifically relates to eggs' physical characteristics. *See* 21 U.S.C. § 1033(r) (definition of "official standards"); 21 U.S.C. § 1052(b).

For instance, "quality" in the context of egg-grading has a particular meaning. The term appears approximately ninety times in the *United States Standards*. As used therein, "quality" specifically refers to an egg's physical characteristics. *See generally United States Standards.* The *Standards* state that an egg grader will determine "[i]nterior egg quality specifications . . . based on the apparent condition of the interior contents of the egg as it is twirled before the candling light." *Id.* § 56.200. Eggs that are "AA Quality" will have, among other things, "practically normal" shells, clear and firm egg whites, and yolks that are only slightly defined when twirled before the candling light, while eggs that are "B Quality" may have abnormal and slightly stained shells, and a weak and watery white such that the yolk is plainly visible when the egg is twirled before the candling light. *United States Standards* §§ 56.201-56.203. In context, the egg-grading regulatory definition of "quality" as "the inherent properties of any product which determine its relative degree of excellence," 7 C.F.R. § 56.1, refers to the physical properties of the egg that determine whether it meets "AA," "A," or "B" quality standards.

"Condition" similarly refers to an egg's physical characteristics. This term is specifically defined by the egg-grading regulations as "any characteristic *detected by sensory examination* (visual, touch, or odor), including the state of preservation, cleanliness, soundness, or fitness for human food that affects the marketing of the product." 7 C.F.R. § 56.1 (emphasis added).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Nothing in the *United States Standards* or regulations indicates that an egg's "quality" or "condition" relates to on-farm welfare conditions or hen enclosure size. To the contrary, these terms clearly relate *solely* to eggs' *physical characteristics*.

### 4.    The Hen Enclosure Law Is Not an Egg-Grading Law, and Does Not Impose "Standards of Quality, Condition, Weight, or Grade" on Eggs

The Hen Enclosure Law is not an egg-grading law, and the government does not allege that it is. *See generally* FAC. The Law is an animal welfare law, concerned with minimum enclosure sizes for egg-laying *hens*, while federal egg-grading standards assess and sort *eggs* based on physical attributes. The Law imposes no "standards of quality, condition, weight, or grade" under the EPIA or the AMA.

The only "quality" assessment at issue in the *United States Standards* is the eggs' physical attributes, such as the definition of their yolks and the firmness of their whites—not the treatment of the hens who laid them. *See supra* §§ III.B.2-3. The Hen Enclosure Law imposes no such "standard[ ] of quality." It does not regulate eggs *at all* based on any of the "quality" attributes laid out in the *United States Standards*.

The only "condition[s]" at issue in the federal egg-grading standards are the "characteristic[s] detected by sensory examination (visual, touch, or odor), including the state of preservation, cleanliness, soundness, or fitness for human food that affects the marketing of the [egg]." 7 C.F.R. § 56.1. The Hen Enclosure Law imposes no such "standard[ ] of . . . condition." It does not regulate eggs at all based on attributes "detected by sensory examination[:]" it only regulates egg sales based on the size of the housing where the *hens*—not the eggs—are kept. This is plainly not an attribute of an egg "detect[able] by sensory examination." *See id*.

The Hen Enclosure Law regulates based on the physical characteristics *of the henhouse where egg-laying hens reside*, not based on any physical characteristic of the *eggs produced*. All

14

eggs sold in-state—regardless of physical attribute or federal grade—must come from hens raised in these conditions. The law is therefore unrelated to federal egg grades. The FAC does not allege that the Hen Enclosure Law alters eggs' physical attributes, let alone those covered by the egg-grading standards. *See generally* FAC. The Hen Enclosure Law therefore does not impose prohibited "standards of quality, condition, weight, quantity, or grade." *See* 21 U.S.C. § 1052(b); *see also* Solicitor General Brief at 7, 19.

> **C.    The United States' Interpretation of the Preemption Clause Is Nonviable**

Ignoring the preemption clause's plain text, the government argues that the EPIA broadly preempts any state law that "prohibit[s] . . . selling eggs with certain disqualifying characteristics." FAC ¶ 8, PageID.382. This prohibition appears nowhere in the clause's ban on state "use of standards of quality, condition, weight, quantity, or grade." 21 U.S.C. § 1052(b). The government unconvincingly claims that sales regulations "operate[ ] as a substantive standard on eggs themselves." FAC ¶ 8, PageID.382. Congress could have written a preemption clause like what the United States seeks—for instance, stating: "no State or local jurisdiction may regulate eggs that travel in interstate commerce." But it did not. "[I]n any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium*, 587 U.S. at 765.

The United States' interpretation directly contradicts the plain language of the EPIA, which only preempts state egg-grading laws regulating based on eggs' apparent, physical attributes, not every state regulation of egg sales. It also violates basic principles of statutory construction. It therefore must be rejected.

***First***, the government's overbroad definition of "quality" and "condition" violates the canon against surplusage because it would swallow and render redundant the other terms in the phrase "use of standards of quality, condition, weight, quantity, or grade." Courts must read

15

statutes "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Cafarelli v. Yancy*, 226 F.3d 492, 499 (6th Cir. 2000) (internal quotations omitted).

The United States argues that the Hen Enclosure Law is preempted because it "imposes standards of quality and condition on eggs themselves." FAC ¶ 59, PageID.391. But if the words "quality" and "condition" can be cherry-picked and made to encompass all of an egg's "inherent properties" or "merchantability," *id.*; FAC ¶ 28, PageID.385, then the remaining words "weight" and "grade" serve no purpose, because those are subsumed in these overbroad definitions. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) ("Adhering to the fair meaning of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."); *see also Thompson v. Goetzmann*, 337 F.3d 489, 501 (5th Cir. 2003) ("[L]itigants cannot cherry-pick particular phrases out of statutory schemes simply to justify an exceptionally broad—and favorable—interpretation of a statute.").

Rather than the broad and amorphous definitions the United States assigns to the terms "quality" and "condition"—encompassing egg attributes as far-reaching as *where the egg-laying hen lived*—those terms have specific meanings in the context of federal egg-grading standards. *See supra* § III.B.3; *United States Standards*. Because the United States' overbroad interpretation of "quality" and "condition" is irreconcilable with the remainder of the preemption clause, it must be rejected.

***Second***, the government's interpretation conflicts with the broader federal egg regulatory scheme. A statute's preemptive reach is determined by "the language of the pre-emption statute and the statutory framework surrounding it." *Lohr*, 518 U.S. at 485-86 (internal quotations

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

omitted). The USDA shares jurisdiction over shell egg safety with the Food and Drug Administration ("FDA"). 21 U.S.C. §§ 1034(d), 1052(b)-(d). The FDA retains primary authority over shell egg safety and has expressly *welcomed* state laws that reduce the risk of egg-borne *Salmonella* using standards that are more "stringent" than federal law. *See* FDA, *Salmonella Enteritidis in Eggs*, 63 Fed. Reg. 27502, 27502 (May 19, 1998); 21 C.F.R. § 118.12(d) (prohibiting any state "requirement regarding prevention of [*Salmonella*] in shell eggs during production, storage, or transportation that is less stringent than those required by this part"); *see also* Solicitor General Brief at 19. The EPIA also permits state regulation to "prevent[ ] the distribution" of "eggs and egg products" in violation of various federal laws "*or any State or local law consistent therewith.*" 21 U.S.C. § 1052(b) (emphasis added).

Consistent with that framework, numerous states have passed laws regulating eggs and/or egg-laying hens to improve food safety and prevent the spread of *Salmonella*. *See, e.g.*, 01-001 Code Me. R. ch. 213; Md. Code Agric. § 4-310; N.Y. Comp. Codes R. & Regs. tit. 1, § 57.7. They have also adopted various versions of the FDA's model food safety code, the FDA Food Code, which imposes more stringent shell-egg safety requirements than the EPIA, such as pasteurization requirements. *See* FDA, *2022 Food Code* at 59, 88 (2022).[8]

Under the United States' definition, each of these state laws would be preempted for imposing "standards of quality" on eggs. FAC ¶¶ 28, 59, PageID.385, 391. Because this position contradicts statutory text and historical practice, it must be rejected. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022) (rejecting an interpretation that "represent[ed] a transformative expansion in [an agency's] regulatory authority," and allegedly located that "newfound power in the vague language of an ancillary provision") (cleaned up).

---

[8] Available at https://www.fda.gov/food/fda-food-code/food-code-2022.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

**IV. CONCLUSION**

For these reasons, the FAC should be dismissed with prejudice.

Dated: May 11, 2026

RILEY SAFER HOLMES & CANCILA LLP

*/s/* Ariel Wilson

Ariel Wilson (MSB P84528)
awilson@rshc-law.com

*Counsel for Defendant-Intervenors*

18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant-Intervenors, certifies that this brief contains 5375 words, which complies with the word limit of Local Civil Rule 7.2(b)(i) and the April 6, 2026 Order of this Court at Dkt. 22. Microsoft Word (Office 365) version 2603 was used to generate this word count.

Dated: May 11, 2026                                   RILEY SAFER HOLMES & CANCILA LLP

/s/  Ariel Wilson
Ariel Wilson (MSB P84528)
awilson@rshc-law.com

*Counsel for Defendant-Intervenors*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS